**Motion to Suppress**

December 3, 1992

THE COURT: All right. We will reconvene with regard to State of Indiana versus William E. Barnhouse. State of Indiana is present by Jeffrey Arnold and we'll show that William E. Barnhouse appears in person and by his counsel, Jack Quirk. We are here on a Motion to Suppress. This is cause number 18D02-9204-Criminal Felony 46. Mr. Quirk?

MR. QUIRK: Yes, Judge. Yesterday about 4:00 I found out that a member of our law firm, Lonna Quirk Hunter, is representing the victim in this case in a case in City Court and she's--.

THE COURT: She's representing the victim of this case? Is



00120

1  this in a case that covers the
2  same subject?
3  MR. QUIRK:  Doesn't have any-
4  thing to do with it.  It's Patri-
5  cia Lasley.  It's the victim
6  and she's--.
7  THE COURT:  And she's simply
8  representing--?
9  MR. QUIRK:  The defendant in
10 a cause of action in City Court.
11 THE COURT:  Where the State
12 of Indiana or City of Muncie
13 may be charging a traffic offense
14 or something--?
15 MR. QUIRK:  It's a D.U.I., driv-
16 ing under the influence.
17 THE COURT:  So, it has absolutely
18 nothing to do with this case?
19 MR. QUIRK:  No, the facts don't
20 except that I've talked with
21 Mr. Barnhouse and, and he is

2

concerned that our law firm
represents himself, plus the
victim and I think that it's
conflict of interest and I think
that if Mr. Barnhouse is con-
victed, I think that would lay
a good foundation for a reversal
and we would ask at this time
to allow me to withdraw and
appoint another attorney for
Mr. Barnhouse.

THE COURT:  Our problem at this
point is this matter has been
set for trial and is scheduled
to go to trial on December the
14th, if I'm correct?

MR. ARNOLD:  That's correct,
Judge.

THE COURT:  Consequently, it's
less than two weeks away.  We
have a hearing this morning

3

1   on the Motion to Suppress. Mr.
2   Barnhouse, I see no conflict
3   as far as Mr. Quirk is concerned
4   in this particular case. It
5   doesn't--. The only thing that
6   happens to be the same is the
7   person who is alleged as victim
8   here happens to be represented
9   by Mrs. Hunter who happens to
10  be in Mr. Quirk's, a member
11  of Mr. Quirk's firm, as a de-
12  fendant in an action brought
13  by the State of Indiana against
14  her, a completely different
15  fact situation. Were this the
16  same fact situation or were
17  Mr. Quirk or were Mrs. Hunter
18  representing the alleged victim
19  in this case with regard to
20  an action against you, then
21  most, most assuredly it would

4

00123

```
1    be a conflict.  I see no conflict
2    with regard to trial of this
3    cause and I think it's important
4    that we do proceed.  Obviously
5    we have the Motion to Suppress.
6    We will proceed to that hearing
7    today.  If you disagree with
8    me, Mr. Barnhouse, we would
9    endeavor to get counsel, but
10   counsel less than two weeks
11   to trial, I know of no attorney
12   who would take on a case in
13   a situation like this where
14   you've got a short time before
15   trial and you've got rather
16   serious charges involved.  Let's
17   proceed with the Motion to Sup-
18   press.  All those who know them-
19   selves to be witnesses simply
20   raise your right hand.  Do you
21   and each of you solemnly affirm
```

5

under penalty for perjury that
the testimony you're about to
give will be truth and if so,
answer I do?

REPLY: I do.

THE COURT: All right.

MR. QUIRK: We'd ask for a Separation of Witnesses.

THE COURT: All right. There be Motion for Separation of Witnesses made, the same be granted. Counsel for each, for State and defendant are required to instruct their witnesses that they are not to talk among this case, among themselves, about this case among themselves or with anyone else. They're not to appear in Court except separately and then to give testimony. They're

6

00125

not to communicate the nature
of their testimony in the court-
room.

MR. ARNOLD:  Judge, I think--.
I guess I'm a little confused
on the mechanics of this.  I
think it's the burden of the
State to show that there were
no Constitutional violations,
but I think it's the burden
of the defendant to move forward
on it first, isn't it?

MR. QUIRK:  I don't think so,
Judge.  I think it's the State's
entire burden to go forward
and--.

THE COURT:  Where there's been
an allegation of Motion to Sup-
press, I think there has to
be a showing of, that there
was a legitimate--.

7

FILED
APR 19 1993

```
 1      MR. ARNOLD:  O.K.  I'd ask the
 2   Court, then, to first to take
 3   judicial notice of the fact
 4   that there was a verified Motion
 5   to Produce, a Request for Discov-
 6   ery filed by the State on May
 7   the 7th of 1992.  It should
 8   be in the Court records.  There
 9   was a verified motion for an
10   Order to Produce, hair, blood,
11   saliva, on May 7th, 1992.  The
12   Court then had an Order to Pro-
13   duce on May 7th of 1992 after
14   a hearing.  Go ahead.
15      MR. QUIRK:  Well, wait a minute.
16   Before we--.  Are you going
17   to address that only right now?
18      MR. ARNOLD:  No.
19      MR. QUIRK:  O.K.  Are you, were
20   you finished with that part
21   of it?
```

8

1   MR. ARNOLD:  Well, I, I bring
2   that up, Judge, because I'm
3   wondering if defense counsel
4   hasn't overlooken, overlooked
5   the dates on these.  In his
6   Motion to Suppress, he states
7   that there was blood samples
8   were taken without the authority
9   of a search warrant and I believe
10  before we had filed for Discovery
11  and the blood and hair samples
12  were taken May the 11th.  They
13  were taken on your authority
14  on the Order to Produce four
15  days afterwards.  The Motion
16  to Suppress says that there
17  was no search warrant.  There
18  was no Order--.
19  THE COURT:  It wasn't a search
20  warrant as such.  It was a Motion
21  to Produce.

9

00128

1    MR. ARNOLD:  That doesn't matter.

2    There's case law on all this,

3    Judge.  In fact, we don't even

4    have to--.  The Order to Produce,

5    we didn't even have to have

6    that.  I'd cite Keller versus

7    Marion County.  That's at 317

8    Northeast Second, 433.  It's

9    a 1974 case.  They state the

10   defendant was subject to the

11   following rules of Discovery

12   and among other things it said

13   permitting the taking of samples

14   of blood, hair and other materials

15   of his body which involved no

16   unreasonable intrusion thereof.

17   They cite the Supreme Court

18   cases in this case.  They go

19   on to say when we consider it,

20   it is well established that

21   the State has the right to

10

fingerprint the defendant, to
photograph him, to examine him
physically, to take samples
of blood, hair and other like
materials from his body and
to secure samples of his hand-
writing, it'd scarcely be argued
that to ask for a list of wit-
nesses he expects to produce
at trial as an invasion of his
Constitutional right against
self-incrimination.

THE COURT:  Be the position
of the Court that the State
having obtained the information,
obtained the hair and blood
samples, obtained the same pur-
suant to an order of this Court
and I think they've met their
burden.  Now if you wish to
go forward--?

11

1    MR. ARNOLD:  I'd just note for

2    the record, Judge, that that

3    was again upheld in Held versus

4    State in 1986 under 492 North-

5    east Second, 671.

6    THE COURT:  Is there any other

7    evidence the defendant wishes

8    to offer at this time?

9    MR. QUIRK:  Judge, I, if you've

10    already overruled the motion--?

11    THE COURT:  All right.

12    MR. ARNOLD:  Before I put--.

13    THE COURT: Motion to Suppress,

14    then, be denied.

15    MR. ARNOLD: Before I put evidence

16    on, then, too, I think I'll

17    just make a short--.

18    THE COURT: Do you wish to pre-

19    sent further evidence then?

20    Be the position of the Court--.

21    MR. ARNOLD: Not on that one,

12

Judge, on this second Motion
to Suppress.

THE COURT: Oh, I'm sorry. All
right. That's with regard to
Motion to Suppress number one
has been denied. You may proceed.

MR. ARNOLD: The second Motion
to Suppress says that agents
of the State were allowed, allow-
ed the alleged victim to view
defendant by himself and with-
out any benefit of any safe-
guard and they're requesting
that all testimony regarding
identification should be ex-
cluded at trial because the
pre-trial identification was
tainted by the agents of the
State. Again, I, there's a
long line of cases and I'm going
to cite a couple of those, Judge.

13

00132

The first would be Olsen versus
State, 563 Northeast Second,
565 and all these cases deal
with show ups, a show up being
where a crime occurred and then
fairly quickly after the crime
occurred, they take the victim
and display the alleged defend-
ant to the victim for identifi-
cation purposes.  In Olsen,
they say that while one on one
confrontations are inherently
suggestive, such confrontations
are not say, not per se improper.
Citing Hill versus State, 1982,
442 Northeast Second, 1049,
it says that confrontations
immediately after the crime,
however, are not per se improper
for it is valuable to have the
witness view a suspect while

14

the image of the perpetrator
is fresh in the witness's mind.
Indeed, the immediacy of the
incident substantially diminish-
es the potential for misidentifi-
cation.  In determining whether
a particular show up is unduly
suggestive, the factors to be
considered include the length
of the initial observation of
the defendant by the person
identifying him, lighting condi-
tions, distance between the
witness and the defendant, the
witness's capacity for observa-
tion and his level of certainty
and discrepancies between the
witness's initial and actual
description and any identifications
of another person.  In the in-
stant case, Reed observed the

15

```
 1     appellant prior to the robbery
 2     and faced appellant throughout
 3     the robbery.  It was a clear
 4     and sunny day.  The identifica-
 5     tion occurred within three hours
 6     after the robbery and occurred
 7     within minutes of notifying
 8     the police.  Reed's identifica-
 9     tion also was accurate in des-
10     cribing the appellant.  We find
11     no error in allowing Reed to
12     identify appellant.  There's
13     a long line of cases that would
14     suggest that, that that, in
15     fact, is very proper because
16     the, the time limit is, allows
17     for the person to identify that
18     without misidentification if
19     you do it quickly enough.  Louis
20     versus State, 554 Northeast
21     Second, 1133, a Supreme Court
```

16

decision in 1990, based on the
same thing where the--.  There
was an alleged burglary.  The
person who owned a house went
outside, saw the defendant jump
in a truck and drive away.  He
tried to follow him.  He was
unable to catch him.  In a very
short time, based upon his des-
cription of the truck and the
license plate, deputies had
pulled that truck over.  They
then called him and brought
him to where they had, had the
defendant, said that the victim
stopped his car behind the de-
puty's car which was behind
the other car.  The deputy got
out and spoke to the two people
in the car.  The defendant who
deputies had learned was the

17

owner of the truck and the de-
fendant's mother.  The deputy
then walked back and asked if
the victim could see the people
in the car.  The victim said
that the one on the right could
be the man who had been in his
house because he could see that
the person had long hair, but
he couldn't see well from behind.
The deputy then had the defendant
step out of the car and the
victim identified him as the
man who had been in his house
approximately two and one-half
hours earlier.  The Court found
that that was, there was no,
no problem there.  There's Les-
lie versus State, 558 Northeast
Second, 813, another Supreme
Court case, which is almost

18

1 the same fact situation.  There's

2 a long line of cases that say

3 this, that that's not improper.

4 What we have in this case is

5 that within minutes after the

6 rape was reported, police officers

7 stopped the defendant on a bi-

8 cycle.  Very quickly then they

9 took the defendant or they left

10 the defendant there.  They put

11 the victim in a police car.

12 She was brought to where they

13 had stopped the defendant on

14 his bicycle.  It was a lighted

15 area.  They took flashlights,

16 put their lights on the defendant.

17 She stayed in the police car

18 and identified the defendant

19 as the person who had raped

20 her.  That's the fact situation

21 that we have here and I'm prepared

19

00138

Fonda King

1                 to put on evidence to that if

2                 it's necessary, Judge.

3                 THE COURT:  You may proceed.

4                 MR. ARNOLD:  O.K.  Go ahead

5                 and call Fonda King.

6                 THE COURT:  Raise your right

7                 hand.  Do you solemnly affirm

8                 under penalty for perjury that

9                 the testimony you are about

10                to give will be truth and if

11                so, answer I do?

12                MS. KING:  I do.

13 F O N D A   K I N G, after first being duly sworn to tell the

14                truth, the whole truth and nothing

15                but the truth was examined and

16                testified as follows:

17 DIRECT EXAMINATION

18 QUESTIONS BY JEFFREY ARNOLD, ESQ.:

19 Q.  Tell the Judge your name.

20 A.  Fonda King.

21 Q.  Fonda, how are you employed?

20

00139

1   A.  I'm Sergeant with the Muncie Police Department.

2   Q.  Were you so employed on April 21st of 1992?

3   A.  I was a patrolman, Muncie Police Department.

4   Q.  And what shift did you work?

5   A.  Midnights, eleven to seven.

6   Q.  O.K.  That evening or in the early morning hours, did

7       you get a call to assist on a rape case?

8   A.  Yes, I did.

9   Q.  Do you know what time you received that call?

10  A.  I do not know the exact time.  I know my exact arrival

11      time, though.  It was 4:23.

12  Q.  O.K.  And what did you find--?  Where did you go?  You

13      say your exact arrival time.

14  A.  I went to the Village Pantry at Council and Jackson.

15  Q.  And once you got there, what did you observe?

16  A.  The victim was standing there and I talked to her.

17  Q.  And her name is?

18  A.  Patricia Lasley.

19  Q.  What did she tell you?

20  A.  She told me she had been raped.

21  Q.  O.K.  Did she describe the assailant?

21

1  A.  Yes.

2  Q.  How did she describe him?

3  A.  He was a white male, five foot nine to five foot ten,

4      thin built, had long, dark brown shoulder length hair,

5      had a mustache and an underbite, was wearing a, a gray

6      sweatshirt and light blue jeans and was riding a bicycle

7      which the handlebars curved back toward the rider.

8  Q.  O.K.  Did you put that out over the radio and to be on

9      the lookout?

10 A.  Yes, I did.

11 Q.  Did you do that immediately?

12 A.  Yes.

13 Q.  Did you subsequently, then, get a, a call that they had

14     stopped someone matching that description?

15 A.  Yes, I did.

16 Q.  How long after you put the B.O.L. out did you get the

17     call that they had stopped someone matching that description?

18 A.  Well, long enough after I put the B.O.L. out the victim

19     and I got in the car and we were a couple of blocks away

20     from the Village Pantry on our way to Ball Hospital and--

21 Q.  Can you give the Judge an idea how long that would have

                              22

1  been?

2  A.  Oh, no longer than five minutes.

3  Q.  No longer than five minutes?  O.K.  What did you do then?

4  A.  I took her, the victim, I drove her to Walnut and Waid

5  where they had this person stopped.

6  Q.  O.K.  And once you got there, what happened?

7  A.  She looked at him and she identified him as being the

8  person who had raped her and was very frightened.

9  Q.  How, where was she during--?  Was she still in the car?

10  A.  Yes, she was in the front seat beside me.

11  Q.  O.K.  And where was the defendant?

12  A.  He was standing on the sidewalk or on m--.  Sh-, he was

13  standing.  I pulled up headed north and it was in front

14  of Wise's, just barely south of Waid and he was standing

15  there beside the bicycle on either the roadway or the

16  sidewalk, right in that vicinity.

17  Q.  What were the lighting conditions?

18  A.  There was outdoor lighting, you know, street lights and

19  such, plus the officers had flashlights.

20  Q.  And did they have the flashlights on?

21  A.  Yes.

23

```
 1   Q.   Where were they pointed?
 2   A.   Well, when, when we pulled up, she became frightened and
 3        she was afraid he would see her and I told her not to
 4        worry, that they would shine the flashlight in his face
 5        so she could see him and he wouldn't be able to see her.
 6   Q.   O.K.  Did they do that?
 7   A.   Yes.
 8   Q.   They had their flashlights in his face?
 9   A.   Well, shining to where that she could see his face.
10   Q.   O.K.  And, again, if, I'm sorry if I've asked, but how
11        far away were you from the defendant?
12   A.   I would say about as far as we are, you and I, or maybe
13        the door.
14   Q.   All right.  She identified him and did she also identify
15        the bicycle at that time?
16   A.   Yes.
17   Q.   What did you do after that?
18   A.   I took the victim to the crime scene.
19   Q.   And to the best of your recollection, this was five to
20        ten minutes after you had put this be on the lookout--?
21   A.   Yes, it--.
```

24

**00143**

1   Q.  Out?

2   A.  Yes.

3   Q.  All right.

4                   MR. ARNOLD:  Nothing further.

5                   THE COURT:  Cross examination?

6   CROSS EXAMINATION

7   QUESTIONS BY JACK QUIRK, ESQ.:

8   Q.  You say you took the victim to the crime scene or to the

9       hospital?

10  A.  I realized I needed to locate the crime scene and I knew

11      it would take a while before we got through at the hospital.

12      So, I went ahead and--.  I wanted to, an exact location

13      of the crime scene.

14  Q.  And did you?  Pardon me.

15  A.  So, that's where I took her to locate the--.

16  Q.  Where did you take her?  Where was the crime scene?

17  A.  It is in the 900 block of West Jackson on the southside

18      of the road behind a vacant building.

19  Q.  And what, what was the lighting conditions there?

20  A.  Um--.

21  Q.  Do you remember?

                              25

1   A.  No, I don't recall.

2   Q.  Now isn't it a fact it was dark in an alley?

3   A.  Well, it's not an alley.  There's a sidewalk I'd say ap-

4       proximately three feet wide behind the building and then

5       it drops off to, I don't know, four to six feet and there's

6       kind of a gully down in there.

7   Q.  Uh huh, but it was not lit, is that correct?

8   A.  Right.

9   Q.  O.K.  Now she described this, this individual--?  Pardon

10      me.  You said this happened in the 900 block of West Jack-

11      son and this individual was stopped where, again?  How

12      far away was it?

13  A.  I'd say approximately two to three miles.  It's, let's

14      see, nine blocks to Walnut and then up Walnut to whatever

15      hundred block Wise's is in which would be approx--.  I'm

16      not certain, say twenty-two or twenty-three.  So--.

17  Q.  Uh huh.  And that'd be more like about five miles away?

18  A.  Let's see.  In, there's sixteen blocks to a mile.  Sixteen--.

19      Let's see.  Nine and twenty-three or so, twenty-three,

20      thirty, about two miles.

21  Q.  O.K.  And whenever you got there, did you see this

26

1     individual?

2  A.  Yes, I did.

3  Q.  And what did he--?  What was he wearing?  Do you have--?

4     By, by--.  Let me rephrase that.  Do you have the clothes

5     that he was wearing?

6  A.  No, I don't.

7  Q.  Does, does somebody in the police department have those?

8  A.  To my knowledge, no.

9  Q.  O.K.  Isn't it a fact that he was wearing a, a black T-

10    shirt?

11  A.  I don't recall.  I do recall he had on a jacket over his

12    other clothing.

13  Q.  O.K.  Do you have your police report there?

14  A.  Yes.

15  Q.  Can you open it up and look at that page that looks like

16    this?  Do you have it?  Does your name appear on there?

17  A.  Yes.

18  Q.  On, on the same thing you're looking at?

19  A.  Yes.

20  Q.  Looking at the, on the number forty-three--.

21  A.  Yes.

27

1  Q.  You said suspect, William E. Barnhouse?

2  A.  Yes.

3  Q.  And then on number forty-seven, the description that was

4      given, what is that description?

5  A.  This description says white male, six foot one, one ninety-

6      seven, brown and hazel, brown hair, hazel eyes and a black

7      T-shirt, blue jacket and blue jeans.

8  Q.  All right.  Now the description that this lady gave you

9      was is that she, he, this person that raped her was about

10     five foot nine or ten, is that correct?

11  A.  Yes.

12  Q.  And also thin, is that correct?

13  A.  Yes.

14  Q.  The reason that William Barnhouse was stopped was because

15     of this description, is that correct?

16  A.  Yes.

17  Q.  At the time that you saw him, did he match the desc--?

18     Was he five foot nine or ten?

19  A.  He was taller than that, but--.

20  Q.  And he was much heavier, too, is that correct?  He wasn't

21     thin?

28

1   A.   I'd say medium, but--.

2   Q.   He also did not have on a gray sweatshirt, is that right?

3   A.   I, I believe that--.   I don't recall.

4   Q.   O.K.

5   A.   I remember the blue jacket.

6   Q.   Well, the report, the report that was made, though, stated

7        that he had a black T-shirt on and blue jacket and blue

8        jeans and the description that she gave you was a gray

9        shirt and light colored jeans, is that correct?

10  A.   Yes.

11  Q.   O.K.

12  A.   May I say something?

13  Q.   Well, probably not.   Let somebody ask you.

14  A.   O.K.

15  Q.   Whenever you took this lady up to there, as soon as you

16       approached the scene, did she expect--?   What, what did

17       you tell her that--?   Where did you tell her you were

18       taking her?

19  A.   I told her I was taking her up to location where that

20       some officers had a person stopped who fit the description.

21  Q.   O.K.   So, she knew at the time whenever she went there

29

00148

1   that she was going to go look at a person that, that the

2   police thought was the person that raped her, is that

3   correct?

4   A.   Yes.

5   Q.   And then when she approached that scene, she was very,

6   she became afraid, is that correct?

7   A.   When she saw him she became afraid.

8   Q.   O.K.   When she approached it and saw it, she became very

9   afraid, is that right?

10  A.   When she saw him, yes.

11  Q.   And then she said that's the one, that's the man, is that

12  correct?

13  A.   Yes.

14                      MR. QUIRK:   I think that's all.

15  REDIRECT EXAMINATION

16  QUESTIONS BY JEFFREY ARNOLD, ESQ.:

17  Q.   And once she got there she not only identified him, but

18  she identified the bicycle?

19  A.   Yes.

20                      MR. ARNOLD:   Nothing further.

21                      THE COURT:   All right.   You

                               30

may stand down.

MR. ARNOLD:  I have no other
evidence, Judge.

MR. QUIRK:  Well, in that case,
Judge, we have no evidence and
we would ask that this, that
our motion be granted.  The
reason being is is that the,
first of all, he doesn't match
the description.  Go ahead.
I'm sorry.

THE COURT:  All right.  You
may proceed.

MR. QUIRK:  The reason being
is that the State's own evidence
would have a description of
an in--.  First of all, we have
an event that takes place in
a dark area and the description
that was given was a person
who was five eight, five nine

31

or five ten, thin built, had
a li-, light gray sweatshirt
on or a gray sweatshirt, pardon
me, and light colored jeans.
She then, that description is
taken, is placed over the radio
and, and some four or five minutes
later, they've got an individual
stopped across town and the
victim is told that she is going
over to look at an individual
who the police think is the
person who raped her because
he matches the description when,
in fact, he didn't match the
description.  The description
given to the, to the police
wasn't six foot one or over
six foot, a hundred and ninety-
seven pound person who was in
dark, she said a dark Levi jacket,

32

1   a black shirt and dark Levis.
2   I think the mere fact that he
3   doesn't match the description,
4   the mere fact that whenever
5   she went there she expected
6   to see the individual who had
7   raped her and the fact that
8   when she got there, the light-
9   ing conditions were much different
10  than what she was seeing.  In
11  fact, she had saw two police-
12  men  holding a flashlight in
13  an individual's face.  Who else
14  was she going to identify?  The
15  two policemen, one of those
16  two policemen?  Doesn't match
17  the description, she expected
18  to see the person who raped
19  her and when she got there,
20  she said he's the man and that's
21  why this was totally suggestive.

33

It wasn't necessary to have
this type of a show up and it
should be suppressed from evi-
dence.

MR. ARNOLD:  Judge, that whole
argument goes to the weight
of that evidence, not the admis-
sibility of it.  If he wants
to argue that she was mistaken
in her identification, again,
that's weight.  We have a fact
situation here that's identical
to the cases that I cited to
you.

THE COURT:  The issue that comes
to my mind is one on the basis
for determination of whether
it's unduly suggestive as the
amount of time that the victim,
alleged victim had to see the,
the defendant and whether she

34

had a sufficient time to identify
him independently. At this
particular point, the, she's
made an identification of a
bicycle. She's made an identifi-
cation of a, of the defendant.
Is there any particular reason
the victim is not here?

MR. ARNOLD: No, I didn't think
I needed her, Judge. It's not--.
These--. It isn't that she
has to identify him again. It's
the procedure that we're talking
about here on the Motion to
Suppress. I had the police
officer testify as to procedure.
I had the police officer testify
that she had identified him.
We're talking procedural mechan-
ics of the show up. I didn't
think I needed her, Judge, and

35

I still don't.  The, these cases
talk about the quicker that
it, that that happens, that
show up, the better it is, O.K.,
because of the possibility of,
of, that there's no misidentifi-
cation.  This happened very
quickly after the alleged rape
and actually happened much quick-
er than these cases that I've
cited to you.  The lighting
conditions were good.  She didn't
hesitate according to the police
officer and this is absolutely
permissible under these Supreme
Court cases.  What Jack's argu-
ing goes to the weight, O.K.?
If he wants to argue that in
a closing or, or cross examina-
tion, I think that's fine, but
it doesn't go to the admissibility

36

of it, Your Honor.

MR. QUIRK: Well, obviously
I argue it different. I don't
even know if I need to say that,
but I--. But when we're talking
about weight, we're talking
about whether or not this was
the procedure that was, was
not tainted by the State of
Indiana or the agents and, and
if you're considering weight,
yeah, that goes to that weight,
but this isn't something that
the Court can just say, well,
it doesn't really matter if
his rights were violated or
not because that just goes to
the weight of the evidence and
that's not the law. What the
Court's got to decide is is
that, first of all, if this

37

1   guy was stopped on the other
2   side of town, he was stopped--.
3   He does not match the descrip-
4   tion.  He was stopped and when-
5   ever she was taken there, she
6   expected to see the person who
7   had raped her in a dark, darken-
8   ed area.  She saw him with his,
9   with two policemen's flashlights
10  in his face.  There's absolute-
11  ly no way that she would have
12  not said that's the person.
13  THE COURT:  The indication from
14  the testimony is that this did
15  occur shortly after the alleged
16  incident, occurred within a,
17  a small distance, a couple of
18  miles of the alleged crime scene.
19  The police comment was not one
20  such as we have the person who
21  committed the offense.  There's

38

```
1    a person who may be or may not
2    be.  Consequently I'll find that
3    at this particular time that
4    there's not sufficient evidence
5    here that this is an unduly
6    suggestive, does not constitute
7    an unduly suggestive individual
8    line-up.  The procedure itself
9    is not sufficient to in and
10   of itself taint beyond redemption
11   the testimony of the alleged
12   victim.  Consequently, the Motion
13   to Suppress be denied.
14   MR. ARNOLD:  Thank you, Judge.
15   THE COURT:  All right.  We're--.
16   This is the State of Indiana
17   versus William Barnhouse, cause
18   number 18D02-9204-Criminal Felony
19   46.  Show Mr. Barnhouse is here
20   in person.  Show Mr. Barnhouse's
21   counsel, Jack Quirk, is present.
```

39

1    Show also present, Mr. Arnold,

2    for the State of Indiana.  Mr.

3    Barnhouse, I had talked to you

4    earlier about this situation

5    and I want, I wanted to be per-

6    fectly clear and I wanted you

7    to be perfectly clear about

8    the situation.  Now Mr. Quirk

9    has indicated that he had desired

10   to withdraw as your attorney

11   to avoid any appearance of im-

12   propriety.  Because of the fact

13   that Anna Hunter who had been

14   in the same firm as Mr. Qu-,

15   who had been in the same firm

16   as Mr. Quirk and it is his daughter

17   happened to be representing

18   the alleged victim in this parti-

19   cular case in Muncie City Court in-

20   volving--.  In that particular

21   situation, she was representing

40

1    the alleged victim as a defense
2    counsel, State of Indiana, ap-
3    parently, versus Mrs. Lasley.
4    In this particular situation,
5    the fact situation is totally
6    different. Mr. Quirk is re-
7    presenting you as your defense
8    counsel as a Public Defender
9    in this case. I see no conflict
10   in evidence. If there were
11   a situation where Mrs. Hunter
12   were attorney for Ms. Lasley
13   filing a case against you in
14   civil matter, I can see that
15   or if Mrs. Hunter were represent-
16   ing a co-defendant in this case
17   whose going to take a position
18   different from yours, I could
19   see a conflict. It is my prefer-
20   ence at this particular time
21   that since this matter is set

41

for trial on December the 14th
and here it is December 3rd,
that we continue to have Mr.
Quirk represent you in this
matter.  Do you have any diffi-
culty with that, Sir?

MR. BARNHOUSE:  No.

THE COURT:  All right.  It is
your desire then that he con-
tinue to represent you?  All
right.  Thank you.  That will
conclude this.

42

00161